*Patrick Rossello v. Zurich American Insurance Company*, No. 24, September Term, 2019. Opinion by Getty, J.

**INSURANCE LAW—INDEMNITY—COMPREHENSIVE GENERAL LIABILITY POLICIES—APPORTIONMENT—PRO RATA—TRIGGER OF COVERAGE—INJURY-IN-FACT TRIGGER—CONTINUOUS TRIGGER**
The Court of Appeals held that damages from a continuous bodily injury judgment must be allocated on a pro rata, time-on-the-risk basis across all insured and insurable periods triggered by the plaintiff's injuries. Informed by the language of Comprehensive General Liability policies and longstanding precedent adopted by the Court of Special Appeals and a majority of other jurisdictions, the Court affirmed the judgment of the Circuit Court for Baltimore City.

IN THE COURT OF APPEALS

OF MARYLAND

No. 24

September Term, 2019

_____

PATRICK ROSSELLO

v.

ZURICH AMERICAN INSURANCE
COMPANY

_____

Barbera, C.J.
McDonald,
Watts,
Hotten,
Getty,
Booth,
Greene, Clayton, Jr.,
(Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Getty, J.

_____

Filed: April 3, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Patrick Rossello was diagnosed with mesothelioma in 2013, nearly forty years after exposure to asbestos at his place of work in 1974. Mr. Rossello subsequently won a $2,682,847.26 judgment against the asbestos installer. Later, the Circuit Court for Baltimore City issued a writ of garnishment requiring the insurer of the asbestos installer to satisfy the judgment. After a series of motions resulting in the court granting the insurer's motion to stay the garnishment, both parties filed cross-motions for summary judgment. The question before the circuit court was how to allocate loss, if at all, among various triggered insurance policies or periods of no insurance because the asbestos installer was only insured by the insurer from 1974 to 1977 through four separate Comprehensive General Liability policies. Mr. Rossello argued that the insurer was liable for the entirety of the judgment spanning forty years, but the Circuit Court for Baltimore City found that Mr. Rossello's damages must be allocated on a pro rata, time-on-the-risk basis across all insured and insurable periods triggered by Mr. Rossello's injuries, i.e., 1974 to 1985—with 1985 being the last practicable year that the asbestos installer could have acquired asbestos liability insurance. Now, we consider whether the circuit court properly applied the pro rata allocation approach, or instead, whether it should have applied a joint-and-several approach that would have required the insurer to cover the entire judgment.

## BACKGROUND

### A. *The Comprehensive General Liability Policies.*

Lloyd E. Mitchell, Inc. ("Mitchell") was a mechanical contractor that sold, distributed, and installed products containing asbestos until 1976 when it ceased all operations. From January 1, 1974 through July 31, 1977, Mitchell was insured by the

Maryland Casualty Company[1] under a series of standard Comprehensive General Liability ("CGL")[2] policy agreements (collectively, the "Policies").[3] Maryland Casualty Company issued one primary insurance policy and one umbrella/excess policy to Mitchell for each of the following policy periods:

January 1, 1974 to January 1, 1975;
January 1, 1975 to January 1, 1976;
January 1, 1976 to January 1, 1977; and
January 1, 1977 to July 31, 1977.

The relevant policy language is substantively the same for each of the Policies.

The Policies require the Maryland Casualty Company to pay on behalf of Mitchell "all sums which the insured shall become legally obligated to pay as damages because

---

[1] Maryland Casualty Company is the predecessor company to Respondent Zurich American Insurance Company. *See* Nina Andrews, *Swiss Insurer to Get Maryland Casualty*, N.Y. Times (Feb. 18, 1989), https://www.nytimes.com/1989/02/18/business/company-news-swiss-insurer-to-get-maryland-casualty.html, archived at https://perma.cc/J54Y-GNRA.

[2] Most American insurance companies use CGL policy agreements—unremarkable form contracts that are devoid of any unique characteristics and that provide reliable terms and conditions. *See, e.g.*, *Lloyd E. Mitchell, Inc. v. Md. Cas. Co.*, 324 Md. 44, 46 n.2 (1991) ("The comprehensive general liability policy is a policy standardized by the insurance industry." (citing 2 R. Long, *The Law of Liability Insurance*, § 11.01 (1979); Comment, *Insurance Coverage of Asbestosis Claims—Running for Cover or Coverage*, 32 Emory L.J. 901, 904 (1983); Comment, *Liability Insurance for Insidious Disease: Who Picks Up the Tab?*, 48 Fordham L. Rev. 656, 666–67, n.50 (1980))); Lee H. Ogburn, *The Progression of Trigger Litigation in Maryland—Determining the Appropriate Trigger of Coverage, Its Limitations, and Ramifications*, 53 Md. L. Rev. 220, 221 (1994) ("[M]ost businesses purchase [CGL policies] to protect against claims that third parties assert for bodily injury or property damage . . . .").

[3] Mitchell was insured prior to January 1, 1974, but those policies are not relevant to this appeal.

of . . . bodily injury . . . to which this insurance applies, caused by an occurrence." The "Definitions" section of the Policies provide two related and important definitions:

"bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The Policies contain two limits on Mitchell's liability: a "per occurrence" limit and an "aggregate" limit. The per occurrence limit is the maximum amount Mitchell will pay for all losses resulting from any one occurrence. The aggregate limit is the maximum total amount Mitchell will pay for all insurable losses regardless of the number of occurrences or losses. Both the per occurrence and the aggregate limits are $1 million for Mitchell's primary policies and $2 million for the umbrella/excess policies.

After it ceased operations in 1976, Mitchell's last policy expired on July 31, 1977, after which it never again acquired insurance.

## B.    *Mr. Rossello's Injury and Suit.*

In 1974, Petitioner Patrick Rossello worked in the Union Trust Bank Building in which Mitchell was performing construction and renovations. Mr. Rossello unknowingly inhaled asbestos originating from the construction products used by Mitchell. Mr. Rossello's injuries developed over the next forty years, manifesting in a mesothelioma diagnosis in 2013. Mr. Rossello brought this strict liability and negligent failure to warn action against Mitchell in the Circuit Court for Baltimore City. The case proceeded to trial in April 2016 and the jury returned a verdict in favor of Mr. Rossello for compensatory

3

damages in the amount of $8,114,166.79. The trial court reduced the judgment for the settlement of joint tortfeasors[4] and entered a final judgment in the amount of $2,682,847.26 plus interest and costs.[5]

To collect his judgment, Mr. Rossello initiated garnishment proceedings against Respondent Zurich American Insurance Company ("Zurich"), successor by merger to Maryland Casualty Company. The Circuit Court for Baltimore City issued a writ of garnishment directed at Zurich as insurer of Mitchell. After a series of motions resulting in the court granting Zurich's motion to stay the garnishment, both parties filed cross-motions for summary judgment. The question before the circuit court was how much Zurich was responsible for paying on the judgment against Mitchell. Mr. Rossello contended that the entire $2,682,847.26 judgment should be satisfied by the 1974 CGL policy, not subject to the per occurrence or aggregate limits. Zurich rebutted that the relevant period of time to allocate the judgment is forty years, 1974 through 2013, i.e., the year of exposure through the year of manifestation and diagnosis of mesothelioma. In that scenario, Zurich would be responsible for one-fortieth of the judgment (or $67,071.19) for each year of coverage, subject to aggregate limits. Zurich argued in the alternative that the relevant time period is twelve years, from 1974 through 1985—1985 being the last year

---

[4] The circuit court directed judgment in favor of Mitchell as to its cross-claims against Cross-Defendants Georgia Pacific LLC and Union Carbide Corporation. That judgment and those parties are not relevant to this appeal.

[5] The Court of Special Appeals affirmed the judgment. *Lloyd E. Mitchell, Inc. v. Rossello*, No. 1191, Sept. Term, 2016, 2018 WL 3323799 (Md. Ct. Spec. App. July 6, 2018).

that asbestos risk insurance was available to Mitchell. In that scenario, $223,570.60 (one-twelfth of $2,682,847.26) would be the maximum amount recoverable from Zurich as to any one policy year from 1974 through 1977, while Mitchell stood self-insured from 1986 to 2013.

In a written opinion and order, the circuit court rejected Mr. Rossello's contention that he is entitled to the entire judgment under the 1974 policy. The circuit court applied Maryland pro rata allocation principles, as adopted in *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, 324 Md. 44 (1991) and *Mayor and City Council of Baltimore v. Utica Mutual Insurance Co.*, 145 Md. App. 256 (2002).[6] Under those principles, the court found that Mr. Rossello's damages must be allocated on a pro rata, time-on-the-risk basis across all insured and insurable periods triggered by Mr. Rossello's injuries—i.e., 1974 to 1985. The court explained:

> The instructions of *Lloyd* and *Utica* are properly applied in this case. Coverage under the Zurich CGL policy was first triggered by [Mr. Rossello's] exposure and inhalation of asbestos in 1974, as the jury found on the evidence at trial. The medical evidence at trial established in the circumstances of the case, that the occurrence of [Mr. Rossello's] bodily injury continued at least until manifestation of [Mr. Rossello's] mesothelioma and diagnosis in 2013. Consequent damages are allocable to the entire period of continuing bodily injury as insurable risk. However, such insurance was not available after 1985, and allocation of damages should extend through insured and insurable policy periods. Sums payable by Zurich will be allocated to the actual policy periods, while Mitchell remains responsible for allocations to insurable periods for which Mitchell elected not to secure coverage.

---

[6] Some cases refer to *Mayor and City Council of Baltimore v. Utica Mutual Insurance Co.*, 145 Md. App. 256 (2002), as "*Utica Mutual*." In this Opinion, we refer to that case as "*Utica*."

A question of fact remained as to the reasonable commercial availability of CGL or excess coverage for any period from 1977 through 1985. At trial, Mitchell did not present any evidence that coverage was unavailable. Still, the court concluded that Zurich was liable for the pro rata portion allocable to each of its four policy periods, ordering garnishment "in the amount of $223,570.60 within the occurrence limit of the 1974" policy and "$223,570.60 for each policy year 1975, 1976, and 1977, subject to the aggregate limits for each year." The circuit court further ordered the parties to proceed to discovery, specifically ordering Zurich to supplement interrogatory answers addressing aggregate limits. Zurich answered the pending discovery, stating that its expert witness determined that the amount owed pursuant to the allocation ruling was $613,233.00. Mr. Rossello initiated further discovery concerning the factual basis and methodology of the expert opinion, but the parties agreed that such discovery would be expensive and time-consuming. Nevertheless, a question remained about the year or years in which Mr. Rossello inhaled asbestos, which would have determined how much each payment was unaggregated versus aggregated.

Mr. Rossello and Zurich then jointly moved for entry of judgment pursuant to Maryland Rules 2-602(b) and 2-501(f),[7] arguing that there was no just reason to delay entry

---

[7] Maryland Rule 2-602(b) provides:

> If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:
>> (1) as to one or more but fewer than all of the claims or parties; or
>> (2) pursuant to Rule 2-501(f)(3), for some but less than all of the amount requested in a claim seeking money relief only.

of the final judgment. In the motion, the parties agreed that Zurich owed Mr. Rossello at least $613,233.00 (the amount distilled by Zurich's expert) under the circuit court's twelve-year allocation order, while Mr. Rossello opined that Zurich could owe as much as $894,282.42.[8] Regardless, the parties agreed that it was prudent to enter an immediate judgment of $613,233.00 under Maryland Rules 2-602(b) and 2-501(f). The circuit court agreed and granted the joint motion. The court noted:

> The expense of further discovery and obtaining a ruling on the precise amount Zurich owes under the allocation ruling will cost substantial time and money to obtain, manage, and analyze a large mass of confidential data; that effort, however, will not minimize or moot [Mr. Rossello's] issues on appeal [that he is owed the entire judgment]. Furthermore, if Mr. Rossello successfully appeals [this circuit c]ourt's allocation ruling, there will be no need to adjudicate the remaining disputes. If [Mr. Rossello] is unsuccessful, the appellate issue and fundamental question, whether or not to allocate the insured loss over time, will not be appealed twice even if the further discovery and revised calculations prove adversarial. If Mr. Rossello's appeal of the 2-602(b) judgment fails, the only risk of lost time would be a second appeal to address how much principal Zurich owes within the range of $613,233.00 and $894,282.42.

---

Maryland Rule 2-501(f)(3) provides:

> The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. By order pursuant to Rule 2-602(b), the court may direct entry of judgment . . . (3) for some but less than all of the amount requested when the claim for relief is for money only and the court reserves disposition of the balance of the amount requested.

[8] $894,282.42 represents $223,570.60 (one-twelfth of $2,682,847.26) in full for each of the four policy years 1974, 1975, 1976, and 1977.

The circuit court thus ordered judgment in the amount of $613,233.00 in favor of Mr. Rossello.

Two weeks later, Mr. Rossello noted an appeal to the Court of Special Appeals. While that proceeding was pending, Mr. Rossello filed, and we granted, a writ of certiorari, bypassing the Court of Special Appeals. *Rossello v. Zurich Am. Ins. Co.*, 464 Md. 587 (2019).

Mr. Rossello presents the following question for our consideration, which we have rephrased:[9]

> Did the circuit court properly prorate a bodily injury judgment to the insurer's time on the risk instead of applying a joint-and-several approach that would have granted the judgment in full?

For the reasons that follow, we answer in the affirmative. The pro rata allocation approach—a longstanding precedent adopted by the Court of Special Appeals and a majority of other jurisdictions—is the correct standard. We affirm the judgment of the Circuit Court for Baltimore City.

## STANDARD OF REVIEW

"The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal." *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 67 (2006) (quoting *Myers v. Kayhoe*, 391 Md. 188, 203 (2006)). "In reviewing a grant of summary judgment under Md. Rule 2-501, we independently review the record

---

[9] Mr. Rossello presented the question as follows: "Does Maryland Law construe Respondent's 1974 insurance policies as promising to pay the judgment in full, contrary to the law of some other states?"

to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Myers*, 391 Md. at 203). "We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Id.*

## DISCUSSION

"Where a continuous occurrence results in injury or damage that triggers coverage under more than one policy, an appropriate method for allocating the losses among the multiple policies (and the policyholder) must be devised." Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes*, § 9.04 (19th ed. 2019). This case requires the Court to "devise" an approach to insurance judgment payments for continuous bodily injury that occurred during and after the insurance policy periods. Zurich and *Amici* insurance companies[10] urge the Court to adopt the pro rata approach, i.e., that each insurer is liable only for that period of time it was on the risk as opposed to the entire period during which bodily injury occurred. In Maryland, the pro rata approach was first adopted in 2002 by the Court of Special Appeals in *Mayor and City Council of Baltimore v. Utica Mutual Insurance Co.*, 145 Md. App. 256 (2002), and has been reaffirmed by that court on several occasions, including as recently as January 31, 2020.

---

[10] CX Reinsurance Company Limited, Travelers Casualty & Surety Company, and the Complex Insurance Claims Litigation Association each filed an amicus brief in support of Zurich.

*See Penn. Nat'l Mut. Cas. Ins. Co. v. Jeffers*, 244 Md. App. 471 (2020).[11] The majority of other states addressing the issue have adopted the pro rata approach.[12]

On the other hand, Mr. Rossello advocates for the minority joint and several or "all sums" approach.[13] That approach would require Zurich to pay the entirety of the judgment against Mitchell but would allow Zurich to pursue claims of contribution against other

---

[11] *Jeffers* was published after the briefings and oral arguments in this case.

[12] Jurisdictions that have adopted pro-rata allocation include Colorado, Connecticut, Kansas, Kentucky, Louisiana, Massachusetts, Minnesota, Nebraska, New Hampshire, New Jersey, New York, South Carolina, Utah, and Vermont. *See Public Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 935 (Colo. 1999); *Sec. Ins. Co. v. Lumbermens Mut. Cas. Co.*, 826 A.2d 107, 121 (Conn. 2003); *Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097, 1134 (Kan. 2003); *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 842 (Ky. 2005); *Arceneaux v. Amstar Corp.*, 200 So.3d 277, 286 (La. 2016);; *Bos. Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 311–16 (Mass. 2009); *N. States Power Co. v. Fidelity & Cas. Co.*, 523 N.W.2d 657, 664 (Minn. 1994); *Dutton-Lainson Co. v. Cont'l Ins. Co.*, 778 N.W.2d 433, 445 (Neb. 2010); *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517, 526 (N.H. 2007); *Owens-Illinois v. United Ins. Co.*, 650 A.2d 974 (N.J. 1994); *Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 695–96 (N.Y. 2002); *Crossmann Cmtys. of N.C. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 599–601 (S.C. 2011); *Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 140–42 (Utah 1997); *Towns v. N. Sec. Ins. Co.*, 964 A.2d 1150, 1167 (Vt. 2008).

[13] States following some form of joint and several liability include California, Delaware, Indiana, Ohio, Oregon, Pennsylvania, Washington, and Wisconsin. *See Armstrong World Indus. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 26 690, 708 (Cal. 1996); *Hercules, Inc. v. AUI Ins. Co.*, 784 A.2d 481, 494 (Del. 2001); *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1058 (Ind. 2001); *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 769 N.E.2d 835, 841 (Ohio 2002); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507 (Pa. 1993); *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 951 P.2d 250, 256–57 (Wash. 1998); *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 759 N.W.2d 613, 616 (Wis. 2009); *see also* Or. Rev. Stat. § 465.480(3)(a) (providing joint and several allocation for environmental claims).

insurers that might have an obligation to indemnify or any tortfeasors who might be jointly and severally liable. In *Utica*, the Court of Special Appeals expressly rejected the joint and several approach. Mr. Rossello avers that contract construction principles and sound public policy require us to adopt the joint and several approach because Zurich agreed to pay "*all sums* which the insured shall become legally obligated to pay as damages because of . . . bodily injury."

As discussed below, we agree with Zurich and will adopt the majority rule of pro rata allocation. In cases such as this one, exposure or injury stretching over many years often implicates multiple insurance policies or periods of no insurance and therefore implicates a continuous or injury-in-fact trigger. When that happens, the next concern is how to allocate loss, if at all, among the various triggered policies. We therefore begin with a discussion of trigger principles as they relate to claims of continuous bodily injury under CGL policies.

## A. *Triggers of Coverage and Continuous Triggers.*

"Resolving the issue of when coverage is triggered is important because only a triggered policy potentially covers the injury." Lee H. Ogburn, *The Progression of Trigger Litigation in Maryland: Determining the Appropriate Trigger of Coverage, Its Limitations, and Ramifications*, 53 Md. L. Rev. 220, 222 (1994) (hereinafter "Ogburn"). A liability insurance policy is "triggered" upon the occurrence of an event that causes the policy to respond to a claim. In other words, a "[t]rigger is a legal rule designed to determine when a policy must respond." *Utica*, 145 Md. App. at 297 (quoting James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate Over the Appropriate Trigger Rule*,

11

45 Drake L. Rev. 625, 652 (1997)); *see Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974, 979 (N.J. 1994) ("[T]he term 'trigger' is merely a label for the event or events that under the terms of the insurance policy determines whether a policy must respond to a claim in a given set of circumstances."). CGL policies, such as the Policies issued to Mitchell, generally define the occurrence of "bodily injury" as a trigger. *See, e.g.*, *Riley v. United Servs. Auto. Ass'n*, 161 Md. App. 573, 583 (2005), *aff'd* 393 Md. 55 (2006).

A trigger is easily applied when the event giving rise to the claim is a sudden accident causing an immediate injury. When a claim arises out of extended exposure to toxic substances, however, the question of when a policy is triggered is more complex. In extended exposure cases such as asbestos inhalation, "it is unclear whether the initial exposure to the substance, the manifestation of the disease, or some event during the latency period triggers coverage." Ogburn at 222. Courts across the country have therefore diverged on trigger theories in extended exposure cases. *See Utica*, 145 Md. App. at 297 ("Although the CGL policy is essentially a standard form, divergent theories have been applied to the trigger of coverage.").

There are four general approaches to the determination of when coverage is triggered under CGL policies in extended exposure cases, each with their respective benefits and pitfalls. These four trigger theories have been characterized as: (1) manifestation theory; (2) exposure theory; (3) continuous theory; and (4) injury-in-fact

theory.[14]  *See, e.g.*, *id.* at 298 (quoting *Owens-Illinois*, 650 A.2d at 980–81) (explaining the "frequently offered theories for the trigger of coverage").  Under a manifestation trigger, courts define coverage under policies that were in effect when damage or injury manifests, i.e., when the harm becomes "reasonably capable of medical diagnosis."  *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 25 (1st Cir. 1982); *see Harford Mut. Ins. Co. v. Jacobson*, 73 Md. App. 670, 684 (1988) ("[T]he date of an 'occurrence' for purposes of determining coverage under an insurance policy is the date when the harm is first discovered.").

Under an exposure trigger, the policies triggered are those in effect when the claimant's person or property was exposed to the substance that produced the damage.  *See, e.g.*, *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1222–23 (6th Cir. 1980); *Hancock Labs., Inc. v. Admiral Ins. Co.*, 777 F.2d 520, 524–25 (9th Cir. 1985).

A continuous trigger implicates policies in effect from the date of first exposure to the harmful substance through manifestation or discovery.  *See, e.g.*, *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1050 (D.C. Cir. 1981).  Lastly, the injury-in-fact trigger commences coverage when actual injury occurs, whether harm is manifest or not.  *See, e.g.*, *Utica*, 145 Md. App. at 298.  The Court of Special Appeals has described the injury-in-fact trigger as follows:

> [T]he "injury-in-fact" (or "damages-in-fact") approach . . . holds that coverage is triggered by a showing of actual injury or damage-producing

---

[14] This is by no means an exhaustive list.  Even among these four theories, courts have differed in applying them to the facts and terms of the insurance policies of the respective cases.

event. Under that theory, coverage is triggered by a real but undiscovered injury, proved in retrospect to have existed at the relevant time irrespective of the time the injury became manifest. [A]fter an injury it may be inferred, that the harm actually began sometime earlier.

*Id.* (quoting *Owens-Illinois*, 650 A.2d at 980–81 (citations, footnotes, original omissions, and internal quotation marks omitted)).

In Maryland, the first appellate court to address trigger theories was the Court of Special Appeals in the 1988 case of *Harford Mutual Insurance Co. v. Jacobson*, 73 Md. App. 670 (1988). In *Jacobson*, the plaintiffs brought a lead paint personal injury action against the estate of a landlord. The plaintiffs' injuries and diagnoses of lead poisoning occurred prior to the inception of the insurance policy provided by the appellant-insurer. The court adopted a manifestation theory and held that the insurer was not liable to indemnify the landlord's estate, its former insured: "[T]he date of an 'occurrence' for purposes of determining coverage under an insurance policy is the date when the harm is first discovered." *Id.* at 684 (discussing, among others, *Mraz v. Canadian Universal Ins. Co., Ltd.*, 804 F.2d 1325, 1328 (4th Cir. 1986) ("[I]n hazardous waste burial cases . . . the occurrence is judged by the time at which the leakage and damage are first discovered.")).

This Court swiftly departed from the manifestation theory just three years later in *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, 324 Md. 44 (1991). In an asbestos case similar to Mr. Rossello's, the trial court relied on the holdings in *Jacobson* and *Mraz* to find that the insurance company was not required to indemnify Mitchell where the injuries did not manifest until after the insurance policies lapsed. The Court vacated the trial court's judgment and held that the trial court "erred in adopting, as the *sole* trigger of coverage,

14

the 'manifestation theory' of coverage, namely, that coverage is not afforded until harm actually becomes manifest." *Id.* at 62. The Court scrutinized the plain meaning of the term "bodily injury" and concluded that because

> "bodily injury" occurs when asbestos is inhaled and retained in the lungs, . . . at a minimum, coverage under the policy to provide a defense and indemnification of the insured is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure.

*Id.*

The Court did not expressly overrule *Jacobson* but distinguished it because it did not involve "an interpretation of the standard form comprehensive general liability insurance policy in the context of asbestos-related personal injury damage claims." *Id.*

A year later, the Court again disapproved of a trigger theory based exclusively on manifestation. In *Harford County v. Harford Mutual Insurance Co.*, 327 Md. 418 (1992), a property damage case, the Court addressed whether "in the context of alleged environmental property damage," the applicable insurance policies are "triggered for the policy periods when the damages take place, as opposed to the policy period when the damages are first discovered or 'manifested.'" *Id.* at 420. The damage resulted from landfill seepage and leakage that contaminated the underlying groundwater over several years. In rejecting the manifestation theory, the Court concluded:

> Notwithstanding the difficulty that may be encountered in determining exactly when contaminants from a landfill may cause property damage, we hold that "manifestation" is not the sole trigger of coverage in environmental pollution cases. Rather, we conclude that coverage under the policies may be triggered during the policy period at a time earlier than the discovery or manifestation of the damage.

*Id.* at 435–36;[15] *see also Scottsdale Ins. Co. v. Am. Empire Surplus Lines Ins. Co.*, 811 F. Supp. 210, 215 (D. Md. 1993) (commenting that "it is clear . . . that the transition from *Mraz* to *Harford County* demonstrates that exposure plus bodily injury (even if unmanifested) is now sufficient under Maryland law to trigger coverage").

In *Utica*, Judge Joseph F. Murphy, Jr., then Chief Judge of the Court of Special Appeals,[16] addressed, among other things, trigger theories. 145 Md. App. at 295–307. The court adopted the "injury-in-fact" trigger theory as the "appropriate trigger of coverage rule for asbestos-in-building property damages," *id.* at 297, concluding that "[n]either the initial exposure (in this case the installation of asbestos in the City's schools), nor the discovery (manifestation) of the injurious effects of the [Asbestos-Containing Building Materials], comports with the 'occurrence' language of the CGL policies, which is predicated in part on 'the continuous or repeated exposure to conditions' that is implicated by the continuing presence of asbestos in the City's buildings." *Id.* at 303. The Court of Special Appeals expressly rejected trigger theories "based exclusively on exposure to harm or the manifestation of injury" and held that the "injury-in-fact" theory would not "preclude coverage under subsequent policies when there is continued exposure." *Id.* at 297, 302.

---

[15] Because the case stemmed from a grant of summary judgment, the *Harford County* Court did not make any further holdings as to the merits in that case. The Court emphasized that it was deciding no more than that the trigger of coverage should not be limited to the time of manifestation or discovery of the property damage and that the insured would have the burden of proving that any discharge of contaminants was "of sufficient gravity to prove detectable 'property damage'" within the meaning of the policies. 327 Md. at 436.

[16] Joseph F. Murphy, Jr., served as Judge (1993–1996) and Chief Judge (1996–2007) of the Court of Special Appeals before serving as Judge of the Court of Appeals (2007–2011).

The court reasoned that "[t]he 'injury-in-fact' and 'continuous' trigger theories are not mutually exclusive, but instead may in an appropriate circumstance be complimentary in the appropriate context." *Id.* at 302–03. In conclusion, the court summarized the appropriate trigger theory:

> With one possible caveat, the appropriate trigger theory for this case is a continuous trigger rule that employs injury-in-fact as the initial triggering event. . . . The caveat . . . is that in order to justify application of the continuous trigger rule, [the insured] has to show that the damage was continuing in nature, as opposed to one-shot or episodic. Otherwise, the policies will be triggered by injury-in-fact.

*Id.* at 303 (omissions and alteration in original) (quoting *GenCorp., Inc. v. AIU Ins. Co.*, 104 F. Supp. 2d 740, 746 (N.D. Ohio 2000)).

This Court most recently clarified the trigger theory in *United Services Automobile Association v. Riley*, 393 Md. 55 (2006). In that case, the Court addressed a lead paint injury that spanned four liability policies and decided whether the limit of liability provisions in each of the policies limited the insurer's liability coverage to a single per occurrence limit. Prior to reaching this Court, the Court of Special Appeals in *Riley* reversed the trial court's decision, holding that an expert's opinion regarding the bodily injuries that plaintiffs suffered was admissible on the trigger issue. *Riley v. United Servs. Auto. Ass'n*, 161 Md. App. 573, 587 (2005). Regarding trigger of insurance coverage and successive policies, the Court of Special Appeals followed the *Utica* model and concluded that "continuous injury, not solely manifestation, is the appropriate trigger in lead paint poisoning cases." *Id.* at 590. The insurance company argued that even if a continuous injury spanned multiple policy periods only one policy is triggered. The intermediate

17

appellate court disagreed, reasoning that "a continuing injury may trigger sequential policies, stacking each of the policies' liability caps" and therefore the insurer's interpretation that only one policy was triggered "would substantially alter liability allocation in continuous injury cases," against the expectations of "the parties when they made those contracts." *Riley*, 161 Md. App. at 591–92.

This Court affirmed, holding that a reasonably prudent person could read the policies to mean that each separate policy was implicated by a continuing occurrence, and the provision did not state that it applied regardless of the number of policies. *Riley*, 393 Md. at 80–82. *Riley*, therefore, made "clear that the law in Maryland is that, in cases" of continuous toxic exposure, "the continuous injury or injury-in-fact trigger is applicable and thus triggers insurance coverage during all applicable policy periods." *Md. Cas. Co. v. Hanson*, 169 Md. App. 484, 515 (2006).

Since *Utica* and *Riley*, the Court of Special Appeals has on several occasions revisited and reaffirmed the continuous or injury-in-fact theory. *See Hanson*, 169 Md. App. at 515 ("[T]he law in Maryland is that, in cases . . . [where there is] proof of repeated exposure to lead, which, in turn, results in lead-based poisoning injuries that continue for several years with continuous exposure, the continuous injury or injury-in-fact trigger is applicable . . . ."); *Jeffers*, 244 Md. App. at 488 ("In cases involving bodily injury resulting from continuous or repeated exposure to harmful substances such as asbestos or lead, Maryland courts employ what is called a 'continuous trigger.'" (citing *Hanson*, 169 Md. App. at 510; *Riley*, 161 Md. App. at 589; *Utica*, 145 Md. App. at 266, 302–03, 304–05));

*see also Robinson v. CX Reinsurance Co., Ltd.*, No. 1888, Sept. Term, 2016, 2019 WL 5173785 (Md. Ct. Spec. App. Oct. 15, 2019).

Maryland's appellate courts have thus made clear that in extended exposure cases, "continuous or progressive damage will constitute an 'occurrence' within the policy period that the asbestos remains [present]." *Utica*, 145 Md. App. at 306. In other words, a policy period is triggered when actual injury occurs and progressive injury can therefore trigger multiple policy periods.

Although this discussion has referred to various trigger theories by name, we must stress that courts and litigants should be careful when referring to such delineated theories. The nomenclature and reference of specific trigger models "can be deceiving," because a court must apply policy language to the factual context before it. *See Utica*, 145 Md. App. at 299 (quoting *Gelman Scis., Inc. v. Fidelity & Cas. Co.*, 572 N.W.2d 617, 622 (Mich. 1998)). Here, as in most of the cases discussed, the trigger analyses involved CGL policies. CGL policies do nothing to clear up the trigger uncertainty because "third party CGL policies do not impose, as a condition of coverage, a requirement that the damages or injury be discovered at any particular point in time." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 887 (Cal. 1995). That may not be true of every insurance policy. Each case must be examined carefully on the facts under the relevant insurance policies.

Solving the trigger issue does not answer the question presented in this case. But in cases like this, exposure or injury stretching over many years often implicates multiple insurance policies or periods of no insurance and therefore implicates a continuous or

injury-in-fact trigger. When that happens, the next concern is how to allocate loss, if at all, among the various triggered policies.

**B.** *Allocation of Coverage.*

The principle concern in this case is the allocation of liability between Zurich and its insured, Mitchell, for the judgment obtained by Mr. Rossello. As with the trigger issue, *Utica* and its progeny directly address this issue. In *Utica*, the Court of Special Appeals held that "the obligation to indemnify the insured under the circumstances of this case, which involves continuing asbestos product property damage, is to be prorated among all carriers based on their time on the risk." 145 Md. App. at 309. Zurich understandably urges the court to adopt the *Utica* approach because it would limit Zurich's indemnification liability to its time on the risk. Mr. Rossello, on the other hand, attacks *Utica*, asks us to overrule it, and advocates for an "all sums" or "joint and several" approach in which he would "be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due." *Id.* at 310 (quoting *Keene*, 667 F.2d at 1050).

This case presents us with the opportunity for the first time to review the allocation holding in *Utica*. For the reasons that follow, we adopt the reasoning of *Utica* and its progeny and thus adopt the pro rata approach to allocation for bodily injury under the CGL policies.

This Court laid the groundwork for *Utica* in *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 355 Md. 566 (1999) when we considered—and effectively refused—to adopt the minority joint and several allocation approach. *Bausch & Lomb* arose from environmental injury that occurred at the insured's facility over a period of thirty years.

20

During that period, the insured had purchased only four years of insurance coverage that covered that type of injury. The insured sought to force the insurer to pay all of the damages, arguing that "so long as the 'property damage takes place, at least in part, during a policy period, it is irrelevant to the insurance company's liability if the property damage also took place in part during another policy period,'" because "the policies' definition of property damage, as that which takes place 'during the policy period,' does not modify [the insurer]'s obligation to pay 'all sums.'" *Id.* at 584. The insurer objected to the insured's attempt to "unilaterally assign" damages associated with thirty years of property damage to "only four years," arguing that its policies did not cover "all sums" without "regard to the timing of the injury." *Id.* at 586. The insurer contended that each of its policies— similar to the Policies here—covered only the damages "payable 'because of' property damage 'which occurs during the policy period.'" *Id.* (citations omitted). The trial court initially ruled that the insured was entitled to recover the entire loss from the single insurer, subject only to the policies' per occurrence limits and deductibles.

On appeal, however, this Court did not accept the insured's "joint and several" allocation argument. The Court explained that the "record in this case is inadequate on the issue of proof of damages," because it contained "no evidence on the amount of environmental property damage . . . during the applicable period." *Id.* at 588. The Court remanded the case to "give [the parties] the opportunity to introduce evidence as to" the determination of the amount of property damage that took place during each policy year. *Id.* at 589. This Court's decision to remand for evidence concerning how much damage took place during each year was a clear indication that the insured's "all sums" argument

21

was inconsistent with the language of the policies. Had this Court agreed with this "joint and several" approach, evidence of the amount of property damage that occurred in each policy period would have been irrelevant, and remand would have been unnecessary. Thus, when presented with the opportunity to adopt joint and several allocation twenty years ago, this Court chose not to do so. *See In re Wallace & Gale Co.*, 385 F.3d 820, 832 (4th Cir. 2004) ("While the question presented in [*Bausch & Lomb*] was not exactly the same as the issue here, it is similar and is an indication to us that the time on the risk decision of the Court of Special Appeals in *Utica Mutual* is not antagonistic to Maryland law. Thus we are not convinced that the Court of Appeals would decide the allocation question differently than did the Court of Special Appeals in *Utica Mutual*.").

*Utica* arose from a coverage dispute involving property damage caused by asbestos. The policies at issue all contained identical CGL language stating that each insurer agreed to pay "on behalf of the insured *all sums* which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence." *Id.* at 284 (emphasis added). The circuit court issued writs of garnishment in favor of Baltimore City, which was seeking to collect on its settlement from the tortfeasor's insurers. The insurers moved for summary judgment, which the circuit court granted. On appeal, the Court of Special Appeals reversed, in part, and affirmed, in part, the grant of summary judgment.

On the allocation of liability issue, the court held that in "continuous trigger" cases "the obligation to indemnify the insured . . . is to be prorated among all carriers based on their time on the risk." *Id.* at 309. The court noted that the pro rata method is most

22

appropriate because it "conforms with the realities of long term property damage resulting from asbestos in buildings, and the application of the injury in fact/continuous trigger of coverage." *Id.*

In its holding, the court explicitly rejected the construction of the "all sums" policy language embraced in *Keene Corporation v. Insurance Company of North America*, 667 F.2d 1034 (D.C. Cir. 1981). In that case, the United States Court of Appeals for the D.C. Circuit concluded that "[t]he only logical resolution of this issue is for Keene to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury." *Id.* at 1050.

The Court of Special Appeals reasoned that the "all sums" indemnification language "must be read in concert with other language that limits a policy's liability for damage or loss that occurs during the policy period." *Utica*, 145 Md. App. at 310–11. Although "not explicitly mandated by the policies," the court noted that pro rata allocation "is consistent with the language of the policies" because the policies provide "indemnification for liability incurred as a result of an accident or occurrence *during the policy period*, not outside that period." *Id.* at 312–13 (emphasis added) (quoting *Consol. Edison Co. v. Allstate Ins. Co.*, 774 N.E.2d 687, 695 (N.Y. 2002)). "This method of allocation apportions the indemnity risk in a manner that is consistent with the manner in which coverage is triggered." *Id.* at 313. The court concluded that losses to the insured during periods when there was no insurance coverage, "unless a gap in coverage [was] due to the insured's inability to obtain insurance," would be apportioned to the insured. *Id.*

23

The *Utica* court thus held

> that (1) the obligation to indemnify the insured . . . is to be prorated among
> all carriers based on their time on the risk, (2) the "joint and several" or "all
> sums" allocation method is incompatible with the injury-in-fact/continuing
> trigger that is applicable to the case at bar, [and] (3) an insured who elects
> not to carry liability insurance for a period of time, either by electing to be
> self-insured, or by purchasing a policy which withholds coverage pursuant
> to a particular exclusion . . . will be liable for the prorated share that
> corresponds to periods of self-insurance or no coverage . . . .

*Id.* at 309.

The Court of Special Appeals has on at least four occasions reaffirmed the *Utica*
apportionment holding. *See Jeffers*, 244 Md. App. at 490; *Riley*, 161 Md. App at 592;
*Hanson*, 169 Md. App. at 512; *see also Robinson*, 2019 WL 5173785, at *5–7. Most
recently, in *Jeffers*, that court refused to overturn *Utica* and adopt an "all sums" approach:

> In a CGL policy, like the . . . policy in this case, an insurer does not make an
> unqualified promise to pay all sums that its insured becomes legally obligated
> to pay as damages because of bodily injury. Instead, the insurer agrees to
> pay those sums that the insured becomes legally obligated to pay because of
> bodily injury *to which the insurance applies*. By its terms, a CGL
> policy . . . applies only to bodily injury that occurs during the policy period.
> An insurer cannot be required to indemnify its insured for an obligation that
> the insurer did not contractually agree to assume. Consequently, in
> determining an insurer's share of an insured's liability when the triggering
> event occurs on a continuous basis over an extended period of time . . . the
> insurer is liable, at most, for its pro rata share of the judgment based on its
> time on the risk.

244 Md. App. at 489 (citations omitted).

The Court of Special Appeals is not the only court to recognize the pro rata approach
in Maryland. For over fifteen years, federal courts applying Maryland law have treated
*Utica* as settled law. *See Penn. Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 113 (4th
Cir. 2012) ("In lead paint or continuous trigger cases such as this one, Maryland courts

24

engage in a 'pro rata by time-on-the-risk allocation' of liability."); *In re Wallace & Gale Co.*, 385 F.3d 820, 833 (4th Cir. 2004) ("For the coverage periods in which effective policies are in force, liability of the insurance carrier is decided . . . by *Utica Mutual*."); *Allstate Ins. Co. v. Rochkind*, 381 F. Supp. 3d 488, 511 (D. Md. 2019) ("[T]he Court of Special Appeals and the Fourth Circuit have made clear that the pro rata method governs damage allocations in continuous injury disputes in Maryland.").

Nor is Maryland alone—the weight of authority from across the country has adopted pro rata allocation. *See supra* note 12. Indeed, since the *Utica* opinion in 2002, nine of the ten state supreme courts to consider the allocation issue rejected the joint and several approach and required proration to time on the risk.[17] Unsurprisingly, then, Mr. Rossello does not cite any post-2002 cases other than those applying *Utica*.

Considering the above discussion, we are unpersuaded by Mr. Rossello's position. In support of adopting the joint and several approach, Mr. Rossello attacks *Utica* on two fronts. He *first* applies contract principles and argues that *Utica* is unresponsive to the policy language.

---

[17] *See Arceneaux v. Amstar Corp.*, 200 So.3d 277, 286 (La. 2016); *Crossmann Cmtys. of N.C. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 599–601 (S.C. 2011); *Dutton-Lainson Co. v. Cont'l Ins. Co.*, 778 N.W.2d 433, 445 (Neb. 2009); *Bos. Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 311–16 (Mass. 2009); *Towns v. N. Sec. Ins. Co.*, 964 A.2d 1150, 1167 (Vt. 2008); *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517, 526 (N.H. 2007); *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 842 (Ky. 2005); *Sec. Ins. Co. v. Lumbermens Mut. Cas. Co.*, 826 A.2d 107, 121 (Conn. 2003); *Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097, 1134 (Kan. 2003). *But see Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 759 N.W.2d 613, 616 (Wis. 2009) (embracing the joint and several allocation approach); *cf. California v. Continental Ins. Co.*, 281 P.3d 1000, 1008 (Cal. 2012) (reaffirming the joint and several approach).

25

Mr. Rossello—and those courts that have adopted the joint and several approach—rely on language found in the standard CGL insuring agreements at issue providing that the insurer would "pay on behalf of the Insured *all sums* which the Insured shall become legally obligated to pay." *See, e.g.*, *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507 (Pa. 1993). Mr. Rossello reasons that, once the occurrence of a bodily injury triggered each policy, each policy became obligated by its terms to pay "all sums" the insured owed as a result of the injury.

This reading, however, is inconsistent with the remainder of the agreement because each policy provides coverage only for "bodily injury . . . which occurs *during the policy period*." One commentator *sums* up this inconsistency succinctly:

> [A]lthough bodily injury may span the entire twenty-year period from exposure to manifestation, the bodily injury to which the year-one policy applies is only the bodily injury occurring in year one, not the bodily injury occurring in years two through twenty. Likewise, the bodily injury to which the year-two policy applies is only the bodily injury occurring in year two, not the injury occurring in year one or in years three through twenty.

Ogburn at 237.

Much like the policies in *Utica*, the pro rata approach is firmly rooted in the plain language of the Policies purchased by Mitchell. Importantly, the Policies require the Maryland Casualty Company to pay on behalf of Mitchell "all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury . . . *to which this insurance applies*, caused by an occurrence."

To Mr. Rossello's point, the definition of "occurrence" includes "continuous or repeated exposure to conditions which result in bodily injury." Read in isolation, that

phrase could be understood to mean that injury occurring over an extended period of time must be covered in the entirety. *See, e.g.*, *J.H. France*, 626 A.2d at 508 ("The insurers which drafted the definition obviously contemplated the possibility of injury resulting from continuous or repeated exposure to conditions, and specified that the process of exposure was to constitute one occurrence."). But reading that definition as support for the joint and several approach confuses "bodily injury" with "occurrence" as they are defined in the Policies. Occurrence is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury," whereas "bodily injury" is defined as "bodily injury, sickness or disease sustained by any person which occurs *during the policy period*." The language of the definitions makes clear that "although the occurrence can take place at any time, the bodily injury must take place during the policy period." Ogburn at 238.

Accordingly, the pro rata approach is unmistakably consistent with the language of standard CGL policies. Indeed, "there is no logic to support the notion that one single insurance policy among 20 or 30 years worth of policies could be expected to be held liable for the entire time period." *Utica*, 145 Md. App. at 311 (quoting *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 940 (Colo. 1999)). Consistent with the policy language limiting coverage to that which occurs "during the policy period," the timing of the injury dictates both the manner in which the policies are triggered and the portion of damages for which each policy is responsible.

Mr. Rossello *second* attempts to distinguish his case from *Utica* because that case arose from damage to property rather than bodily injury. But as the circuit court in this case correctly identified, "[t]he policy terms, not the nature of the damages, are

27

determinative in adjudicating what policy amounts are subject to garnishment." There is no meaningful difference between the policy language as it applies to property damage versus bodily injury. Like with bodily injury, Zurich is responsible for "all sums which the insured shall become legally obligated to pay as damages . . . to which this insurance applies, caused by an occurrence."

The reasoning in *Utica* is equally sound when applied to "bodily injury." The *Utica* court recognized the poor fit between the joint and several approach and long-term injuries under the language of the CGL:

> [C]ollecting all the indemnity from a particular policy pre-supposes ability to pin an accident to a particular policy period. Although more than one policy may be implicated by a gradual harm, joint and several allocation is not consistent with the language of the policies providing indemnification for "all sums" of liability that resulted from an accident or occurrence "*during the policy period*."

*Id.* at 312 (quoting *Consol. Edison Co. of N.Y., Inc.*, 774 N.E.2d at 695 (citations omitted)). The pro rata method, on the other hand, "apportions the indemnity risk in a manner that is consistent with the manner in which coverage is triggered"—a feature that is not unique to property damage. *Id.* at 313. We decline to read *Utica* as narrowly as Mr. Rossello.

*Amici* in support of Mr. Rossello provide a third attack on *Utica* and the pro rata approach—this time a public policy argument.[18] *Amici* aver that the pro rata approach is "unfair, unworkable, and cause[s] unnecessary complication" that might be avoided by applying the joint and several approach. We disagree. Not only is pro rata allocation

---

[18] Daquantay Robinson and Brionna Heckstall, unpaid judgment creditors in lead paint cases, filed an amicus brief in support of Mr. Rossello.

consistent with the policy language, but it also serves important public policy objectives.

As adopted by the majority of states, proration is easy to administer, efficient, and as noted above, consistent with the reasonable expectations of the contracting parties.

Our sister states have exalted the benefits of pro rata and decried the shortfalls of joint and several:

> [T]he joint and several allocation method is improvident. It does not solve the allocation problem; it merely postpones it. This method divides the case into two separate suits: in the first suit, the insured selects and sues one of the triggered insurers; in the second suit, the selected insurer then sues other triggered insurers for contribution. In this way, despite its advocates' claims to the contrary, the joint and several method does not decrease litigation costs, does not give courts guidance as to how to allocate liability, and requires insurers to factor the costs of uncertain liability into their premiums.

*EnergyNorth Nat. Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517, 527 (N.H. 2007) (quotation marks and citations omitted).

Federal courts have similarly recognized the benefits of pro rata allocation:

> [W]here the policies triggered are provided by multiple insurers, [pro rata] allocation avoids saddling one insurer with the full loss, the burden of bringing a subsequent contribution action, and the risk that recovery in such an action will prove to be impossible because, for instance, the insurer of other triggered policies is unable to pay. Allocation results in the insured bearing the risk of any of its insurers' inability to pay, instead. There is logic in having the risk of such defalcation fall on the insured, which purchased the defaulting insurer's policy, rather than on another insurer which was a stranger to the selection process.

> Allocation also forces an insured to absorb the losses for periods when it self-insured and can prevent it from benefitting from coverage for injuries that took place when it was paying no premiums. Allocation may also be more efficient because "any contribution proceeding will involve many of the same issues that are raised in the initial liability proceeding, and . . . it is more efficient to deal with these issues in a single proceeding."

29

*Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 323 (2d Cir. 2000) (quotation marks and citations omitted) (quoting *In re Prudential Lines Inc.*, 158 F.3d 65, 85 (2d Cir. 1998)).

In sum, "pro rata allocation produces a more equitable result than joint and several allocation, which 'creates a false equivalence between an insured who has purchased insurance coverage continuously for many years and an insured who has purchased only one year of insurance coverage.'" *Bos. Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 311 (Mass. 2009) (quoting *Wallis & Cos.*, 986 P.2d at 939–40). "[T]he pro rata allocation method promotes judicial efficiency, engenders stability and predictability in the insurance market, provides incentive for responsible commercial behavior, and produces an equitable result." *Id.*

We therefore hold, as the Court of Special Appeals did in *Utica*, that (1) the obligation to indemnify Mitchell under the circumstances of this case, which involves continuing asbestos bodily harm, is to be prorated based on Zurich's time on the risk; (2) "the 'joint and several' or 'all sums' allocation method is incompatible with the injury-in-fact/continuing trigger that is applicable to the case at bar"; and (3) "an insured who elects not to carry liability insurance for a period of time . . . will be liable for the prorated share that corresponds to periods of self-insurance or no coverage. . . . unless a gap in coverage is due to the insured's inability to obtain insurance." *See Utica*, 145 Md. App. at 309, 313.

We find it prudent to address a collateral issue—namely, that the insured will be liable for the prorated share that corresponds to periods of self-insurance or no coverage "*unless a gap in coverage is due to the insured's inability to obtain insurance.*" *Id.* at 313

30

(emphasis added). In other words, allocation is not appropriate where coverage was not available.

In this case, the parties agree that CGL asbestos coverage was not commercially available to Mitchell after 1985. A question of fact remained, however, as to the reasonable commercial availability of CGL or excess coverage for any period between 1977—when Mitchell unilaterally decided to terminate its coverage—and 1985—the last year CGL policies provided coverage for asbestos damage. Mitchell presented no evidence to rebut the assumption that CGL coverage *was* available between 1977 and 1985. To be clear, Mitchell's decision not to purchase coverage does not render that coverage unavailable for purposes of the pro rata calculation. *See id.* at 313 n.54.

As the gap-in-coverage issue applies to this case, we can say it no better than the circuit court:

> Coverage under the Zurich CGL policy was first triggered by [Mr. Rossello's] exposure and inhalation of asbestos in 1974, as the jury found on the evidence at trial. The medical evidence at trial established in the circumstances of the case, that the occurrence of [Mr. Rossello's] bodily injury continued at least until manifestation of [Mr. Rossello's] mesothelioma and diagnosis in 2013. Consequent damages are allocable to the entire period of continuing bodily injury as insurable risk. However, such insurance was not available after 1985, and allocation of damages should extend through insured and insurable policy periods. Sums payable by Zurich will be allocated to the actual policy periods, while Mitchell remains responsible for allocations to insurable periods for which Mitchell elected not to secure coverage.
>
> The burden to show that insurance was unavailable falls on the defendant in the underlying case, and the record reflects, in this case, that Mitchell did not meet that burden. Zurich identifies 1985 as the last year CGL insurance provided coverage for asbestos damage, making 1985 the last year in which Mitchell could be insured for such damage. Consistent with *Lloyd* and *Utica*, Zurich is correct that the relevant period for allocation of

31

the judgment is 12 years, beginning in 1974, the date of [Mr. Rossello's] exposure, and ending in 1985, the last year Mitchell could have purchased insurance for asbestos related damages.

## CONCLUSION

The circuit court properly concluded that Zurich was liable for the pro rata portion allocable to each of its four policy periods, ordering garnishment "in the amount of $223,570.60 within the occurrence limit of the 1974" policy and "$223,570.60 for each policy year 1975, 1976, and 1977, subject to the aggregate limits for each year." We therefore affirm the circuit court's entry of partial summary judgment in favor of Zurich.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**