*CX Reinsurance Company Limited and Liberty Mutual Mid-Atlantic Insurance Company v. Devon S. Johnson, et al.*, No. 47, September Term, 2021. Opinion by Biran, J.

**INSURANCE – GENERAL LIABILITY INSURANCE POLICIES – INTENDED BENEFICIARIES – VESTING OF RIGHTS OF TORT CLAIMANTS –** Petitioners are insurance companies (the "Insurers") that issued commercial general liability policies (the "Policies") to several Baltimore residential landlords (the "Landlords") that included coverage for bodily injuries resulting from lead paint exposure at the Landlords' rental properties. After allegedly discovering material misrepresentations in the Landlords' initial policy applications, one of the Insurers filed contract rescission actions against the Landlords. Eventually, those rescission cases were settled. Under the terms of the settlements, the coverage for lead paint-related losses was substantially reduced or, in some instances, completely eliminated. Respondents are tort claimants (the "Claimants") who allege that they suffered bodily injuries as a result of their exposure to lead paint while residing in the Landlords' rental properties. The Court of Appeals held that the relevant provisions of the Policies make clear that those Claimants who do not hold final judgments against the Landlords (and who have not entered into settlement agreements with the Landlords, with the Insurers' approval) are not intended beneficiaries of the Policies. No Maryland statute, regulation, or current public policy overrides the terms of the Policies such as to make all tort claimants intended beneficiaries of general liability insurance policies. The Claimants who did not have final judgments against their Landlords prior to the settlements of the rescission cases do not have the right to enforce the pre-settlement terms of the Policies, provided the settlements were made in good faith, rather than being collusive. Under the terms of the Policies, those Claimants who obtained final judgments before the settlements of the rescission cases became intended beneficiaries of the Policies as of the date they obtained their judgments in the trial court and, therefore, have the right to enforce the pre-settlement terms of the Policies.

Circuit Court for Baltimore City
Case No. 24-C-18-001930
Argued: April 4, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 47

September Term, 2021

_____

CX REINSURANCE COMPANY LIMITED
AND LIBERTY MUTUAL MID-ATLANTIC
INSURANCE COMPANY

v.

DEVON S. JOHNSON, ET AL.

_____

*Getty, C.J.
Watts
Hotten
Booth
Biran
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned)
McDonald, Robert N.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Biran, J.

_____

Filed: August 29, 2022



Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

*Getty, C.J., now a Senior Judge, participated in the
hearing and conference of this case while an active
member of this Court. After being recalled pursuant
to Md. Const., Art. IV, § 3A, he also participated in
the decision and adoption of this opinion.

For many years, CX Reinsurance Company Limited and its predecessor entity ("CX"), in combination with Liberty Mutual Mid-Atlantic Insurance Company and its predecessor entity ("Liberty Mutual"), issued commercial general liability policies (the "Policies") to several Baltimore residential landlords (the "Landlords") that included coverage for bodily injuries resulting from lead paint exposure at the Landlords' rental properties. After allegedly discovering material misrepresentations in the Landlords' initial policy applications, CX filed contract rescission actions against the Landlords in 2015. Eventually, CX and the Landlords settled the rescission cases. Under the terms of the settlements, the coverage for lead paint-related losses was substantially reduced or, in some instances, completely eliminated.

CX and Liberty Mutual (collectively, the "Insurers") are the Petitioners in this case. The Respondents are 15 tort claimants (the "Claimants") who allege that they suffered bodily injuries as a result of their exposure to lead paint while residing in the Landlords' rental properties. The majority of the Claimants had not obtained final judgments against, or entered into settlements with, the Landlords before CX and the Landlords settled the rescission cases.

In the Circuit Court for Baltimore City, the Claimants filed suit against the Insurers and the Landlords, seeking a declaration that: (1) the Claimants are "intended third-party beneficiaries" of the Policies; and (2) the settlements between CX and the Landlords do not modify or affect the insurance proceeds available under the Policies to indemnify the Landlords with respect to judgments obtained by the Claimants against the Landlords. The

circuit court ruled that the Claimants are intended beneficiaries of the Policies and granted summary judgment in the Claimants' favor. The Court of Special Appeals affirmed.

As discussed below, the relevant provisions of the Policies make clear that those Claimants who do not hold final judgments against the Landlords (and who have not entered into approved settlement agreements with the Landlords) are not the primary parties in interest under the Policies. No Maryland statute, regulation, or public policy recognizes tort claimants who do not hold judgments against insureds as intended beneficiaries of general liability insurance policies. That being the case, the language of the Policies controls here. To the extent the Claimants do not hold judgments against, and have not entered into approved settlement agreements with, the Landlords, they are not intended beneficiaries of the Policies. Therefore, assuming that they eventually do obtain judgments against, or enter into settlements with, their Landlords, those Claimants will not have the right to enforce the terms of Policies as they existed prior to the rescission case settlements, provided that those settlements were the product of good-faith, non-collusive negotiations. Those Claimants who obtained final judgments against their Landlords prior to the settlements of the applicable rescission cases may enforce the pre-settlement terms of the Policies.

# I

## Background

As stated above, the circuit court granted the Claimants' motion for summary judgment. In the light most favorable to the Insurers,[1] the record reflects the following:

### A. The Policies

Beginning in 1997, the Landlords submitted applications to CX to obtain commercial general liability insurance policies. The applications included Question 16, in which CX asked whether "the Insured [has] ever had any lead paint violations in the building(s)?" Each of the Landlords answered "No" to this question on the application itself or, if they left that question blank, they allegedly otherwise provided CX with a negative response to that question. Based on these negative responses, CX issued the Policies, which included coverage relating to bodily injuries resulting from exposure to lead-based paint at the Landlords' covered properties during the policy term. Specifically, the Policies provided that

> we[2] will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" arising out of the Ingestion, Inhalation, absorption of, or exposure to lead, lead-paint or other lead-based products of any kind, form or nature whatsoever to which the insurance provided by this endorsement applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our

---

[1] *See, e.g.*, *Rossello v. Zurich Am. Ins. Co.*, 468 Md. 92, 103 (2020) (when analyzing a grant of summary judgment, an appellate court "review[s] the record in the light most favorable to the nonmoving party and construe[s] any reasonable inferences that may be drawn from the facts against the moving party") (internal quotation marks and citation omitted).

[2] In the Policies, "we" or "us" referred to the Insurers, and "you" referred to the "Named Insureds" (as relevant here, the Landlords).

discretion investigate any "occurrence" and settle any claim or "suit" that may result.

Included in the Policies was a "Schedule of Named Insureds," identifying the first Named Insured as well as other Named Insureds and identifying the insured properties in a "Schedule of Locations." The Policies also contained a "Changes" provision stating:

> This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

The Policies also included a "Cancellation" provision allowing CX or the first Named Insured to cancel the policy. Nothing in the Policies required CX or the first Named Insured to obtain the consent of any other Named Insured or any other person or entity before exercising the right of cancellation or agreeing to a change in terms.

In addition, the policies included a "Legal Action Against Us" provision, stating that:

> No person or organization has a right under this Coverage Part:
>
> a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
> b. To sue us on this Coverage Part, unless all of its terms have been fully complied with.
>
> A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4

For lead paint claims, the Policies purported to cover up to $1,000,000 for any one "occurrence" and, depending on the policy, up to $1,000,000 or $2,000,000 in the aggregate. The Insurers continually renewed the Policies for more than a decade.[3]

**B. The Change in the Legal Landscape Regarding Liability for Lead-Paint Claims**

In 1994, the Maryland General Assembly enacted the Reduction of Lead Risk in Housing Act, which, among other things, effectively placed a $17,000 cap on lead-related personal injury compensation by providing immunity from suit to owners of "affected properties" who made "qualified offers" of up to $17,000 to persons "at risk" of ingesting lead at the properties. H.B. 760, 1994 Leg., 408th Sess. (Md. 1994). Based, at least in part, on this recently adopted legislation, the Insurers decided to offer their commercial general liability insurance products to the Landlords. While the Policies on paper provided for up to $1,000,000 in coverage per claim of bodily injury resulting from exposure to lead paint, the Landlords' liability for each such claim effectively was capped at $17,000.

The landscape relating to lead-paint claims changed with this Court's 2011 decision in *Jackson v. Dackman Co.*, 422 Md. 357 (2011). In that case, we held that the immunity provisions in the Reduction of Lead Risk in Housing Act violated Article 19 of the Maryland Declaration of Rights. *Id.* at 382-83. As a result, the Insurers' potential exposure for lead-related personal injury claims under the Polices increased substantially.

---

[3] Beginning in 1999, CX's underwriting agent, Continental Coverage Corporation ("CCC"), issued the renewal policies to the Landlords on behalf of Liberty Mutual. Under a "Fronting Arrangement," CCC made the underwriting decisions with respect to the Policies issued by Liberty Mutual, and CX was responsible for the administration and payment of covered claims.

## C. The Rescission Actions

In 2015, CX filed actions against the Landlords in the United States District Court for the District of Maryland, seeking recission of the Policies. Among other theories, CX claimed that the Landlords had made material misrepresentations in their initial applications for insurance by falsely answering Question 16 concerning prior "lead paint violations in the building(s)[.]" According to CX's Complaints, prior to the Landlords submitting their applications, the Baltimore Department of Health had cited the Landlords and/or other Named Insureds for lead paint violations in numerous buildings included on the Policies' Schedules of Locations. CX further alleged that, if the Landlords had truthfully answered Question 16, CX would not have issued the Policies.

Over the next several years, CX and the Landlords litigated the various rescission cases. Eventually, the parties entered into settlements to resolve CX's claims. Six of the settlements resulted in amendments to the Policies that reduced, but did not fully eliminate, coverage; three of the agreements resulted in mutual rescission of the underlying policies altogether.

## D. This Litigation

In April 2018, one of the Claimants, Devon S. Johnson, filed a Complaint for Declaratory Judgment against his former Landlord and CX in the Circuit Court for Baltimore City. As the litigation progressed, more Claimants joined the action, and their former Landlords, as well as Liberty Mutual, were added as defendants.

The operative complaint in the case is the Third Amended Complaint for Declaratory Judgment, which the Claimants filed in June 2019. The Claimants allege that

6

they are former residents of insured properties owned by the Landlords, and that they were damaged as a result of their exposure to lead paint existing at those properties. They further allege that they were not parties to the agreements between CX and the Landlords that settled CX's rescission cases, and that they did not consent to the purported modifications and rescissions of the Policies. The Claimants sought a declaration that, among other things, they are "intended third party beneficiaries" of the Policies, and that the settlements between CX and the Landlords do not operate to reduce the applicable policy limits of the Policies with respect to themselves or to "any other claimant who has vested rights" in the Policies.

Of the 15 Claimants, three (Devon Johnson, Chauncey Liles, and Shyliyah Streeter) obtained judgments against their Landlords for lead paint-related injuries prior to the settlement of the applicable rescission actions between CX and the Landlords.[4]

The parties filed cross-motions for summary judgment. After conducting a hearing, the circuit court granted the Claimants' motion for summary judgment and denied the Insurers' motions for summary judgment. The court ruled that: (1) the Claimants "are third-party beneficiaries of the Policies"; (2) the Claimants "have vested rights in the Policies as they existed before being rescinded by agreement or modified pursuant to the Rescission Settlement Agreements between [CX] and the Landlord Defendants"; and (3) the "Rescission Settlement Agreements do not affect [the Claimants'] vested rights in the

---

[4] A fourth Claimant, Lea Gardner, obtained a final judgment against her former Landlord on January 24, 2019. The record reflects that CX and Ms. Gardner's former Landlord settled their rescission case on or about August 16, 2016.

7

Policies, and the Rescission Settlement Agreements are ineffective as to [the Claimants]….”

The Insurers appealed, and the Court of Special Appeals affirmed the judgment of the circuit court. *CX Reinsurance Co. Ltd. v. Johnson*, 252 Md. App. 393 (2021). The Court of Special Appeals concluded that “injured tort claimants are intended third-party beneficiaries of liability insurance policies.” *Id*. at 414. The court rejected the notion “that to be an intended third-party beneficiary of an insurance policy, the injured party must first obtain a judgment or execute a settlement agreement with a covered insured.” *Id*. at 415. The intermediate appellate court further held that the Claimants “obtained vested rights in [the] Policies when they suffered their injuries.” *Id*. at 426. That being the case, “the Insurers and [L]andlords could not subsequently modify [the Policies] pursuant to the Rescission Settlement Agreements.” *Id*.

The Insurers filed a petition for writ of *certiorari* with this Court, which we granted. *CX Reinsurance Co. Ltd. v. Johnson*, 476 Md. 583 (2021). We combine the three questions the Insurers asked us to review into one: Did the trial court properly grant summary judgment to the Claimants on the ground that they are intended beneficiaries of the Policies?[5]

---

[5] The Insurers sought review of these questions:

> (1) Whether the [Court of Special Appeals] erred in refusing to interpret insurance policies like other contracts, concluding that “sound public policy dictates that liability insurance policies should be construed to protect injured tort claimants” notwithstanding their terms?

## II

## Standard of Review

Because "[t]he question of whether a trial court's grant of summary judgment was proper is a question of law," this Court reviews it *de novo*, without deference to the decisions of the lower courts. *Rossello v. Zurich Am. Ins. Co.*, 468 Md. 92, 102 (2020) (internal quotation marks and citations omitted). "In reviewing a grant of summary judgment …, we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Id*. at 102-03 (internal quotation marks and citations omitted). "We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Id*. at 103 (internal quotation marks and citation omitted).

---

(2) Whether the [Court of Special Appeals] erred in holding that all claimants, who have asserted or will assert claims, are intended beneficiaries of insurance policies, with vested interests in those policies from the date of their alleged injuries, and have the same rights under those policies as claimants, who have obtained judgments or entered into settlements?

(3) Whether the [Court of Special Appeals] erred in holding that an insured and its insurer cannot resolve litigation by entering a settlement, in good faith, that modifies or reduces insurance coverage without the consent of all current and future tort claimants?

## III

## Discussion

The Claimants maintain that the Insurers and the Landlords did not have the power to reduce or eliminate coverage under the Policies to the detriment of the Claimants. The parties agree that the validity of that contention depends, in the first instance, on whether the Claimants are "intended beneficiaries" of the Policies or, instead, whether they are "incidental beneficiaries." If the Claimants are not intended beneficiaries, but merely incidental beneficiaries, then they have no vested rights in the Policies.

According to the Insurers, the Policies do not manifest any intention to make the Claimants the primary parties in interest until they either hold a final judgment against their Landlords or have entered into an approved settlement with their Landlords. The Insurers contend that the Policies are designed to protect the financial interests of the Landlords in exchange for the payment of premiums to the Insurers. Further, the Insurers contend that no Maryland statute, regulation, or public policy dictates that tort claimants are intended beneficiaries of general liability insurance policies prior to the entry of a final judgment against an insured. Therefore, the language of the Policies is dispositive and requires this Court to conclude that the Claimants are not intended beneficiaries of the Policies to the extent they have not obtained final judgments against, or entered into approved settlements with, their Landlords. Rather, they are incidental beneficiaries of the Policies, and are subject to changes in the Policies that result from good-faith litigation settlements between the Insurers and the Landlords.

10

The Claimants argue that prior Maryland cases, as well as persuasive out-of-state authority, compel the conclusion that tort claimants are intended beneficiaries of general liability insurance policies, and that they have vested rights in such policies from the moment they are injured. As such, they argue, CX and the Landlords could not rescind or modify the coverages that were contained in the Policies to the detriment of the Claimants and others similarly situated.

For the reasons stated below, we agree with the Insurers.

## A. Governing Principles

### 1. Construction of Insurance Policies

"Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer. Rather, following the rule applicable to the construction of contracts generally, … the intention of the parties is to be ascertained if reasonably possible from the policy as a whole." *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 166 (1997) (internal quotation marks and citation omitted); *see also Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 252 (1999) ("In Maryland, insurance policies are treated like other contracts."). Thus, "[e]xcept as modified by statutes or regulations, the legal principles applicable to contracts generally are also applicable to insurance policies." *Mesmer*, 353 Md. at 252. This means that "any clause in an insurance policy that is contrary to the public policy of this State, as set forth in any statute, is invalid and unenforceable." *Harleysville Mut. Ins. Co. v. Zelinski*, 393 Md. 83, 88-89 (internal quotation marks and citation omitted).

In most circumstances, the duty of an insurer to defend against actions and indemnify an insured in the event of an adverse judgment arises from, and is governed by, the terms of the applicable insurance policy. *See Mesmer*, 353 Md. at 257-58 ("We have repeatedly indicated that the obligation to defend and the obligation to indemnify are entirely contractual."); *see also Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 409 (1975) ("The promise to defend the insured, as well as the promise to indemnify, is the consideration received by the insured for payment of the policy premiums.").

2. Intended Beneficiaries Versus Incidental Beneficiaries

At common law, only a party to a contract could initiate an action to enforce its terms. *120 W. Fayette St., LLLP v. Mayor and City Council of Baltimore*, 426 Md. 14, 35 (2012). However, the law has evolved since, such that certain beneficiaries to a contract may also bring an action to enforce its terms. *Id.* at 35-36. Not all third parties that may benefit from a contract have the power to initiate an action to enforce its terms. *See id.* at 36 ("It is not enough that the contract merely operates to an individual's benefit[.]"). Rather, a third party has the right to enforce a contract "if the contract was intended for his [or her] benefit and it ... clearly appear[s] that the parties intended to recognize him [or her] as the primary party in interest and as privy to the promise." *Id.* (internal quotation marks and citation omitted). Such a third party is referred to as an "intended beneficiary." *Id.* at 35-36.

The "crucial fact" in determining whether a third party is an intended beneficiary of a contract is "whether the pertinent provisions in the contract were 'inserted … to benefit' the third party." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 457 (2012)

(quoting *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 261, 265 (2009)). Another "factor to consider … is whether the third party is named in the contract or its antecedent agreements." *Id.* (internal quotation marks and citation omitted); *see also* Restatement (Second) of Contracts § 302(1) (Am. Law Inst. 1981) ("Restatement") (stating that, "[u]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties" and either "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance"); *Lovell Land*, 408 Md. at 262 & n.6 (citing with approval the distinction between intended and incidental beneficiaries set forth in Restatement § 302). "In applying this standard, we look to the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention[.]" *CR-RSC Tower I*, 429 Md. at 458 (internal quotation marks and citation omitted).[6]

A beneficiary of a contract who is not an "intended beneficiary" is an "incidental beneficiary," who "acquires by virtue of the promise no right against the promisor or the promisee." *120 W. Fayette St.*, 426 Md. at 36 (quoting *Lovell Land*, 408 Md. at 261 (citation

---

[6] We noted in *CR-RSC Tower I* that consideration of "surrounding circumstances" was apparently "a deviation from the general rule for interpreting contracts, under which we do not consider 'extrinsic evidence' of the parties' intent unless the language of the contract is ambiguous." *Id.* at 458 n.61.

omitted)); *see also* Restatement § 302(2) ("An incidental beneficiary is a beneficiary who is not an intended beneficiary.").

In *120 W. Fayette Street*, this Court highlighted the distinction between intended and incidental third-party beneficiaries. In that case, Baltimore City entered into a Memorandum of Agreement ("MOA") with the Maryland Historical Trust (the "Trust") detailing how certain historic properties were to be treated under a plan to renew a five-block area in the City. 426 Md. at 16-17. After the Trust's director granted approval of the City's plans, 120 West Fayette Street, LLLP ("120 West Fayette") filed an action seeking a declaration of rights under the MOA in order to challenge the approval. *See id.* at 17. The circuit court found that 120 West Fayette was neither a party to, nor a beneficiary of, the MOA between the City and the Trust, and, based primarily on this finding, dismissed the complaint for failure to state a claim upon which relief could be granted. *Id.* at 23-24.

When the case came before this Court, we considered whether 120 West Fayette was an intended beneficiary, or rather an incidental beneficiary, of the MOA. *Id.* at 36. We observed that "[t]he promises and benefits set forth in the MOA are directed solely to the City and the Trust" and "[n]owhere in the MOA is it contemplated that 120 West Fayette is to receive a benefit." *Id.* Therefore, we concluded that "the parties to the MOA did not intend to recognize 120 West Fayette as the primary party in interest and as privy to the promise." *Id.* at 37 (cleaned up). It followed "that 120 West Fayette, at best an incidental beneficiary to the MOA, may not file a suit requesting declaratory judgment that interprets and enforces an agreement to which it has no part." *Id.* Thus, this Court recognized the

14

parties' intent, as evidenced by the terms of the contract itself, as the primary determinant of whether a third party is an intended or an incidental beneficiary to a given contract.

We also addressed the distinction between intended and incidental beneficiaries in *CR-RSC Tower I*, 429 Md. at 457. In that case, we analyzed two separate ground leases entered into between two landlords of adjoining properties and two developers who sought to create two "intertwined, mutually-dependent towers." *See id.* at 456 (cleaned up). "Neither ground lease would have been executed had the other not been executed simultaneously." *Id.* (cleaned up). After project delays resulted in financing for the project falling through, the developers sued the landlords. *Id.* at 401-03, 451 n.54. The jury found in favor of the developers and entered an award of damages against the landlords jointly and severally. *Id.* at 403. Each landlord was responsible for each developer's damages because "[t]he jury found that each [developer] was entitled to enforce the [other's] ground lease, either as a third-party beneficiary ... or a third-party entitled to the benefit of a covenant running with the land[.]" *Id.* at 454 (internal quotation marks omitted). The Court of Special Appeals reversed the damages award, concluding that there was insufficient evidence to support either theory of joint and several liability. *Id.*

This Court affirmed. As to the intended beneficiary theory, we contrasted the developers with the beneficiaries in *Shillman v. Hobstetter*, 249 Md. 678 (1968), and *Prescott v. Coppage*, 266 Md. 562 (1972). *CR-RSC Tower I*, 429 Md. at 456-60. *Shillman* involved an agreement between a residential developer and a lender under which the lender agreed to issue conditional commitments for certain planned homes if the developer would refund certain purchasers' deposits. 249 Md. at 682-83. The *Shillman* Court held that the

purchasers to whom the deposits were to be returned were intended beneficiaries of the contracts. *Id.* at 690. As we explained in *CR-RSC Tower I*, "[t]he only thing the developer [in *Shillman*] promised to do under the agreement (return the deposits) was clearly intended to benefit the purchasers, so logically we found that the purchasers were intended third-party beneficiaries." 429 Md. at 459 (citing *Shillman*, 249 Md. at 690).

*Prescott v. Coppage* concerned the receivership of Maryland Thrift Savings and Loan Company ("Maryland Thrift"). Prescott was appointed special counsel to Maryland Thrift's receiver. 266 Md. at 574. Coppage sued the receiver, as well as Prescott and others, after the receiver paid creditors with lower priority than Coppage, leaving insufficient assets to fully pay the debt that Maryland Thrift owed to Coppage. *Id.* at 565-66. The order appointing the receiver required the receiver "to take possession of [Maryland Thrift's] assets and property and hold or dispose of them under the direction, supervision and further order of this Court." *Id.* at 574 (internal quotation marks omitted). The order also required the receiver "to mail a copy of the order of appointment to each creditor of Maryland Thrift[.]" *Id.* (cleaned up). In reversing the trial court's judgment in favor of Prescott, this Court explained that "the order of appointment of [Maryland Thrift's receiver] itself makes clear that all creditors of Maryland Thrift were third party beneficiaries. The order of appointment of Prescott by necessary implication bound him to those creditor beneficiaries." *Id.* Thus, this Court held that Prescott was jointly liable with the receiver to Coppage. *Id.* at 576.

In *CR-RSC Tower I*, we observed that the documents at issue in *Shillman* and *Prescott* "were created specifically to benefit the third parties in question." *CR-RSC Tower*

16

*I*, 429 Md. at 459. "The same cannot be said of the ground leases" at issue in *CR-RSC Tower I*, "which were clearly entered into first and foremost for the benefit of the parties that signed them." *Id*. Important in our analysis was that:

> In each ground lease, the purported third-party beneficiary is mentioned only briefly and in passing – to wit, in sections involving easements running between the two parcels, plans for the development of common areas, and overall site plans that mention both towers. The peripheral nature of these provisions – which simply describe the joint nature of the two projects – is substantially different from the central provisions in *Shillman* and *Prescott*, which demonstrated how the third parties in those cases were "owed ... a duty under the contract[s]." This, we said, was the "crucial fact" in support of finding a third-party beneficiary, and it is not present here.

*Id*. at 459-60 (footnotes omitted).

**B. The Claimants Are Not Intended Beneficiaries of the Policies Until They Obtain a Final Judgment Against, or Enter into a Settlement Agreement with, Their Landlords.**

As discussed above, three of the Claimants obtained final judgments against their Landlords prior to the settlements between their Landlords and CX in the rescission actions. Thus, under the terms of the Policies, those Claimants became intended beneficiaries of the Policies as of the date they obtained their judgments against the Landlords in the trial court. After they secured the judgments, those three Claimants had the right to enforce the pre-settlement terms of the Policies,[7] both under the terms of the

---

[7] Thus, the Court of Special Appeals' holding that the Claimants are intended beneficiaries of the Policies is correct as to these three Claimants (Devon Johnson, Chauncey Liles, and Shyliyah Streeter). However, these Claimants' rights under the Policies vested at the time they obtained their judgments against the Landlords, not at the time of injury. We therefore affirm the judgment of the Court of Special Appeals as to these three Claimants on different grounds than the Court of Special Appeals articulated.

17

Policies themselves and under Maryland's "direct action" statute, Md. Code Ann., Ins. ("IN") § 19-102(b) (1995, 2017 Repl. Vol.).[8] The Insurers acknowledge these points.[9]

Thus, we focus the remainder of our analysis on those Claimants who had not obtained final judgments against their Landlords before CX and the Landlords purported to reduce or eliminate the coverage available under the Policies through the settlements in the rescission cases. We conclude that those 12 Claimants were not intended beneficiaries of the Policies at the time of the rescission settlements. First, the plain language of the Policies evinces no intent to make tort claimants, without final judgments against the

---

[8] The Maryland "direct action" statute provides:

Each liability insurance policy issued in the State shall provide that:

> (1) the bankruptcy or insolvency of the insured does not release the insurer from liability; and
> (2) if an injured person or another person claiming by, through, or under the injured person is unable, after execution on a final judgment entered in an action against an insured, to recover the full amount of the final judgment, the person may bring an action against the insured's insurer in accordance with the terms of the policy for the lesser of the amount of the judgment recovered in the action against the insured or the amount of the policy.

IN § 19-102(b).

[9] At oral argument, a Judge asked counsel for the Insurers: "So those Claimants who had judgments, you agree that the rescission settlements don't apply to them?" Counsel replied: "They do not and they did not." In response to follow-up questions, the Insurers' counsel indicated that, in the instance "where there is a verdict which has not yet been reduced to a judgment," the tort claimant nevertheless would be deemed to have secured a "final judgment" within the meaning of the "Legal Action Against Us" provision. In other words, as counsel for the Insurers acknowledged, under the "Legal Action Against Us" provision, a claimant becomes an intended beneficiary once he or she prevails against an insured in the trial court.

Landlords (or who have not entered into approved settlements with the Landlords), primary parties in interest. Second, no Maryland statute, regulation, or public policy overrides the intent of the parties who entered into the insurance contracts at issue here.

1. <u>The Language of the Policies Demonstrates That Only Tort Claimants Who Have Obtained a Final Judgment Against, or Who Have Entered into an Approved Settlement with, a Landlord Are Intended Beneficiaries.</u>

Under the plain language of the Policies, tort claimants do not become intended beneficiaries with the right to enforce the Policies' terms until they hold final judgments against the Landlords or have entered into approved settlements with the Landlords. Several of the Policies' terms lead to this conclusion.

First, the Policies provide that the Insurers "will pay those sums that the Insured [Landlord] *becomes legally obligated to pay as damages* because of 'bodily injury' … arising out of the Ingestion, Inhalation, absorption of, or exposure to lead, lead-paint or other lead-based products of any kind[.]" (Emphasis added.) In the next sentence, the Policies say that the Insurers "will have the right and duty to defend any 'suit' *seeking those damages*." (Emphasis added.) Based on the language of these provisions, it is clear that the parties to these insurance contracts understood and agreed that the Landlords would not "become legally obligated to pay" any damages until the conclusion of a "suit seeking those damages."

Second, the "Legal Action Against Us" provision states that "[n]o person or organization has a right … [t]o join us as a party or to otherwise bring us into a 'suit' asking for damages from an insured; or … [t]o sue us on this Coverage Part, unless all of its terms have been fully complied with." However, this provision goes on to state that "[a] person

19

or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial."[10] Thus, this provision evinces the parties' intent to create enforceable rights in the Policies for tort claimants only if and when claimants obtain a judgment against a Landlord after a trial or enter into an approved settlement with a Landlord.

Also relevant to our understanding of the parties' intent with respect to tort claimants are the "Changes" and "Cancellation" provisions. The "Changes" provision states that "[t]he first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent." The "Cancellation" provision allows CX or the first Named Insured to cancel the policy. Nothing in these provisions requires CX or the first Named Insured to obtain the consent of any other person or entity before exercising the right of cancellation or agreeing to a change in terms. Read together with the "Legal Action Against Us" provision, it is clear that the parties to the Policies intended to allow the Insurers and the first Named Insureds to modify or eliminate coverage, but that any such changes would not affect the vested rights in the Policies of tort claimants who

---

[10] The Claimants contend that this provision "merely restates Maryland's direct action statute, which requires that each liability policy issued in the state include language authorizing injured persons who obtained judgments to bring damages claims directly against insurers." The Claimants overlook that the "Legal Action Against Us" section goes beyond the direct action statute by allowing individuals who are parties to approved settlements to enforce those settlements directly against the Insurers in court. In any event, the important point is that, with the exception of approved settlements, the Policies go no further than the direct action statute in conferring rights on third parties to enforce the terms of the Policies.

20

had secured judgments against, or entered into approved settlements with, their Landlords prior to the time of the cancellation or modification of coverage.

These provisions of the Policies collectively reflect that the parties did not intend to confer a benefit on a tort claimant who has not obtained a final judgment against, or who has not entered into an approved settlement with, an insured. The "primary parties in interest" in the Policies are the Landlords, who receive protection for losses, and the Insurers, who provide that protection in exchange for the payment of premiums. Like the ground leases in *CR-RSC Tower I*, the Policies at issue here "were clearly entered into first and foremost for the benefit of the parties that signed them." *CR-RSC Tower I*, 429 Md. at 459. Thus, tort claimants without final judgments or settlements are not additional parties in interest under the plain language of the Policies. In other words, they are incidental beneficiaries to the Policies.

The Claimants attempt to avoid this straightforward reading of the Policies' language by contending that, under *Megonnell v. USAA*, 368 Md. 633 (2001), a tortfeasor has a "legal obligation" to pay damages from the moment a claimant is injured as a result of tortious conduct, rather than when the claimant enters into a settlement or prevails at trial. Thus, according to the Claimants, when the Policies refer to the Landlords "becom[ing] legally obligated to pay … damages," the Policies must be interpreted to mean the moment a potential tort claimant is harmed as a result of an insured's acts or omissions.

In *Megonnell*, this Court observed that "[p]arties often become legally obligated ('liable') to pay by way of contract, i.e., construction contracts, leases, insurance contracts, etc., or by committing tortious acts. The verdict of a jury and the judgment of a court are

21

merely a determination that a legal obligation existed, and continues to exist. The verdict of a jury and the judgment of the court do not, of themselves, create the underlying legal obligation." 368 Md. at 645.

*Megonnell* did not involve the question of whether a tort claimant without a judgment was an intended beneficiary of an insurance policy. Unlike most of the Claimants here, the plaintiff in *Megonnell* obtained a $291,000 judgment against her husband (the driver in a car accident), after which she made a claim for payment under the excess coverage provision of her husband's umbrella policy. Under that provision, the insurer promised to "pay for injury or damage for which an insured becomes legally liable." *Id.* at 639. Before the wife's case came to trial, the insurer settled with two accident victims for a total of $700,000. *Id.* at 638. The insurer denied the wife's claim, among other reasons, based on its contention that the two prior settlements did not count toward the $500,000 per accident limit in the husband's primary auto policy. *Id.* at 645. The insurer contended that "an insured cannot be legally liable until a jury or court finds that person liable," which therefore meant that the wife could not reach the excess coverage in the umbrella policy. *Id.*

This Court rejected the insurer's argument, holding that there was "no reason why the $700,000 cumulative settlement with the [other claimants] should not be applied toward the $500,000 per occurrence liability limits of the primary policy." *Id.* at 646. In this regard, the Court focused on the meaning of "damages," and held that "[d]amages are not limited to court-ordered payments; they can be claims made prior to trial that are resolved by settlements requiring the payment of sums of money. If respondent chooses to settle a claim

for damages and actually pays the damages without a trial, the damages are still going towards satisfying the limit of liability for all damages." *Id.* at 648 (internal quotation marks omitted).[11] Thus, *Megonnell*'s holding is consistent with the Policies' recognition of approved settlements as providing vested rights to tort claimants.

The Claimants conflate tort "liability" in general with an insured "becom[ing] legally obligated to pay … damages." It is clear that the parties to the Policies intended that only approved settlements with, and final judgments against, the Landlords would trigger the Insurers' legal obligation to pay damages. We do not read *Megonnell* as engrafting a different meaning onto this provision of the Policies.

We also disagree with the Claimants' contention that "[t]he surrounding circumstances of liability insurance policies establish that those policies are not private contracts between the insurer and policyholder to benefit only the policyholder." In this regard, the Claimants cite *Phillips v. Allstate Indemnity Co.*, 156 Md. App. 729, 746 (2004), for the proposition that a "liability insurance policy is 'generally issued for the benefit of third parties who are injured and have a claim against a tortfeasor.'" (quoting 7 COUCH ON

---

[11] Similarly, in *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, 408 B.R. 66 (D. Md. 2009), the federal district court rejected the notion that Porter Hayden (the insured) could not become "legally obligated to pay" damages to asbestos plaintiffs following the discharge of its bankruptcy. *Id.* at 71-73. Citing *Megonnell*, the court reasoned that "Porter Hayden has an underlying, though contingent, legal obligation to the asbestos claimants because it committed [tortious] acts. That Porter Hayden had a legal obligation to the claimants before entering bankruptcy, or in the absence of bankruptcy, satisfies the requirement of a 'legal obligation' within the meaning of the policies." *Id.* at 72. The court invoked Maryland's direct action statute, noting that "bankruptcy or insolvency of the insured does not release the insurer from liability." *Id.* at 73 (quoting IN § 19-102(b)(1)). *Porter Hayden*, like *Megonnell*, did not involve the question of whether a third party was an intended beneficiary under the policies at issue.

23

INSURANCE § 104:8 (3d ed. 2003)). However, *Phillips* and many of the other cases upon which the Claimants rely involve compulsory motor vehicle liability insurance and, therefore, are distinguishable from this case.

Motor vehicle liability insurance policies are subject to a different set of considerations than other types of insurance policies. In *Van Horn v. Atlantic Mut. Ins. Co.*, 334 Md. 669 (1994), this Court considered whether Maryland's statute compelling automobile insurance, and specifically imposing certain policy termination requirements, abrogated an insurance company's general contractual right to rescind the contract. In concluding that it did, this Court stated:

> In situations where a motor vehicle insurance policy is compelled by law, where the statutes do not expressly preserve the right of rescission *ab initio*, and where claims of innocent parties are involved, the cases throughout the country, with apparent unanimity, take the position that rescission *ab initio* is inconsistent with the statutory scheme. Among the jurisdictions with statutory enactments similar to Maryland's, some cases rely on the statutory requirement that insurance be maintained, some cases rely on provisions similar to [Maryland statutory provisions] restricting the right to cancel, and some cases rely on both types of statutes. Nevertheless, all of the cases reach the same result, namely that rescission is impermissible to defeat claims like those involved in this case.

*Id*. at 687. We further observed that "[a]ttempts by insurance companies, purporting to exercise contract rights, to avoid the public policy of compulsory motor vehicle insurance with mandated coverages, have repeatedly been rejected by this Court." *Id*. at 686 (citations omitted). By making motor vehicle liability insurance mandatory in Maryland, the General Assembly established a public policy that every motor vehicle insurance contract is intended to benefit the general public, not just the parties to the insurance contract.

Unlike primary motor vehicle liability coverage, lead-related insurance coverage, and coverage under commercial general liability policies more broadly, is not mandatory under Maryland law. Indeed, the General Assembly has made it clear that an "authorized insurer *may* include in the policy a lead hazard coverage exclusion." IN § 19-704(c) (emphasis added). Unlike automobile insurance policies, lead-related insurance policies have not been "modified by statutes or regulations" to be compulsory or otherwise adjusted in a way that would change the applicability of the relevant contractual provisions. For this reason, the Claimants' reliance on motor vehicle liability insurance cases is misplaced.

Other cases upon which the Claimants rely are also inapposite for additional reasons. Some of those cases, like *Megonnell*, involve plaintiffs who already had secured final judgments. For example, in *Travelers Ins. Co. v. Godsey*, 260 Md. 669 (1971), the jury had already returned a verdict for the plaintiff and the insurer had agreed to a consent judgment when the insurer learned that the verdict was the result of collusion between the insured and the plaintiff. *Id.* at 671-72. In explaining why the insurer was permitted to stop payment on checks it had issued in satisfaction of the consent judgment, this Court stated:

> [T]he right of the injured claimant to collect from the insurer of the one who harmed him derives from the contract right of the tortfeasor to have the insurer pay for him within the policy limit what otherwise he would be liable to pay. As the third party beneficiary of the insurance contract, the claimant stands in the shoes of the insured wrongdoer and vis-a-vis the insurer his rights are no greater than those of the insured's. *See Shillman v. Hobstetter*, 249 Md. 678, 690, 241 A.2d 570. It makes no difference that here the third party beneficiary is suing on drafts issued by the insurer to pay the debt of its insured to the claimant, rather than as is usually or often the case, seeking to recover on an attachment laid in the hands of the insurer after judgment has been recovered against the insured. Whatever procedural mode the claimant follows, the effort is to compel the insurer to pay the insured's obligation to

25

> the claimant, and therefore in such a situation that which we call a rose by any other name would smell as sweet.

*Id.* at 674. The reference to the plaintiff in *Godsey* as a "third party beneficiary" is of no assistance to the Claimants. As the holder of a favorable jury verdict and a consent judgment, the plaintiff in *Godsey* would be considered an intended beneficiary under the Policies here as well.

In *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 646-47 (1999), this Court assumed for purposes of the opinion that the plaintiffs "had a viable cause of action in contract as third-party beneficiaries" of an agreement between an insurance broker and its customer under which the broker was supposed to procure motor vehicle liability insurance for the customer. Explaining the basis for this assumption, the Court stated: "We have recognized a similar third-party beneficiary cause of action in contract when a tort claimant sues the tortfeasor's liability insurer for a declaratory judgment concerning coverage or for breach of the contractual duty to indemnify." *Id.* As support for this proposition, the Court cited two automobile cases – *Mesmer*, which we have cited above, and *Washington Metro. Area Transit Auth. v. Queen*, 324 Md. 326, 332 (1991) – as well as *Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 412-413 (1997).

Although *Woodfin Equities* is not an automobile insurance case, it does not support the Claimants' position. Far from endorsing a blanket rule under which every tort claimant is deemed to be an intended beneficiary of a liability insurance policy that provides coverage for the alleged tortfeasor, *Woodfin Equities* demonstrates that there is no such

rule. There, this Court distinguished between direct actions to enforce policy terms and declaratory judgment actions to resolve coverage disputes:

> Maryland public policy ordinarily does preclude an injured claimant from initially bringing a direct action against the alleged tortfeasor's liability insurer to litigate the matter of the insured's tort liability, as distinguished from a declaratory judgment action concerning separate and independent policy coverage issues…. [T]he Maryland restriction upon direct actions against a defendant tortfeasor's liability insurer applies only "until there has been a determination of the insured's liability in the tort action. Once there is a verdict or judgment in the tort action, a direct action may be maintained against the liability insurer."

*Woodfin Equities*, 344 Md. at 413 (quoting *Washington Metro. Area Transit Auth.*, 324 Md. at 332).

*Woodfin Equities* also demonstrates that the Claimants confuse their right to obtain a ruling in this litigation under the Declaratory Judgment Act with the right to enforce the Policies' terms. As *Woodfin Equities* makes clear, a tort claimant's ability to bring a declaratory judgment action raising an issue related to coverage under a liability insurance policy and the claimant's ability to sue the insurer to enforce the terms of the policy are not equivalent.

Under the Declaratory Judgment Act:

> *Any person interested under* a deed, will, trust, land patent, *written contract*, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, administrative rule or regulation, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, administrative rule or regulation, land patent, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it.

Md. Code Ann., Cts. & Jud. Proc. § 3-406 (2020) (emphasis added).

The Claimants note that the Declaratory Judgment Act does not define what it means to be "interested under a . . . written contract." According to the Claimants, "*120 West Fayette* fills in the gap, holding that for a third party to have a sufficient interest to bring a declaratory judgment action to interpret a contract, that party cannot be a mere incidental beneficiary of the contract." Thus, the Claimants argue, because all acknowledge that they have the right to bring this declaratory judgment action, they must be intended beneficiaries, as opposed to incidental beneficiaries, of the Policies. We disagree.

In *120 West Fayette*, the Court stated "that 120 West Fayette, at best an incidental beneficiary to the [contract], may not file a suit requesting declaratory judgment that interprets *and enforces* an agreement to which it has no part." 426 Md. at 37 (emphasis added). Had 120 West Fayette sought a declaration only "interpreting" and not also "enforcing" the contract, perhaps it would have been deemed sufficiently "interested in" the contract to have standing under the Declaratory Judgment Act. 120 West Fayette's request for a declaration *enforcing* the contract, however, implicated not just standing under the Declaratory Judgment Act, but also Maryland contract law principles. It was those principles that this Court relied on in holding that 120 West Fayette, as an incidental beneficiary of the contract, had no right to enforce the contract.

2. <u>No Maryland Statute, Regulation, or Public Policy Requires That All Tort Claimants Be Treated as Intended Beneficiaries of General Liability Insurance Policies.</u>

The Claimants have not cited any Maryland statute or regulation that overrides the intent of the parties to these insurance contracts to bestow enforcement rights only on those Claimants who hold final judgments against, or who have entered into approved

settlements with, the Landlords. The only statute or regulation that governs the rights of third parties in this context is the direct action statute, IN § 19-102(b), which restricts the direct right of action against insurers to those claimants who are "unable, after execution on a final judgment entered in an action against an insured, to recover the full amount of the final judgment[.]"

Although the direct action statute does not itself provide all tort claimants with a right of action to enforce liability insurance policy terms, the Claimants contend that it nevertheless reflects the existence of a Maryland public policy to "recognize[] injured tort claimants' coverage rights, regardless whether they hold tort judgments." According to the Claimants, "[t]o adopt any other rule would permit insurers to defeat the purpose of the direct action statute by doing exactly what Insurers attempt to do here: eliminate the insurance at will after the injury but before judgment to prevent a tort claimant's recovery from the insurer." In support of this proposition, the Claimants cite a treatise, which observes (without citing supporting authority) that "[d]irect-action statutes have resulted from the current public policy that recognizes that a liability insurance policy is generally issued for the benefit of third parties who are injured and have a claim against the tortfeasor." 7 COUCH ON INSURANCE § 104:8 (3d ed. 2003).

We are not persuaded. If the General Assembly had intended to provide enforcement rights to tort claimants who have not obtained judgments or entered into approved settlements, it presumably would have drafted Maryland's direct action statute differently. None of the authorities the Claimants cite convinces us otherwise. As the Insurers note, *Corpus Juris Secundum* states as the "general rule" that, "in the absence of policy or

29

statutory provisions to the contrary, one who suffers an injury which comes within the provisions of a liability insurance policy is not in privity of contract with the insurance company." 46A C.J.S. Insurance § 1959, Westlaw (database updated May 2022). Thus, "a third party ordinarily may not directly sue an insurance company in an attempt to obtain the coverage allegedly due the insurer's policyholder. The plaintiff is not in privity of contract with either the defendant or the defendant's insurance company under the liability insurance policy and is not considered a third party beneficiary of the policy." *Id.* (footnote omitted). If direct action statutes like Maryland's reflected a public policy to allow all tort claimants to enforce general liability insurance policies, the "general rule" presumably would be that all claimants are third party beneficiaries of general liability insurance policies.

As the Court of Special Appeals observed, there is a split of authority in other jurisdictions regarding whether injured tort claimants are intended third-party beneficiaries of liability policies. *CX Reinsurance*, 252 Md. App. at 14 & n.6. The out-of-state cases upon which the Claimants rely either are inapposite in that they concern automobile insurance[12] or are not in keeping with our understanding of Maryland public policy. In particular, we note that, in *Farm & City Ins. Co. v. Coover*, 225 N.W.2d 335 (Iowa 1975), the Supreme Court of Iowa stated:

> Iowa's direct action statute gives an injured person who obtains a judgment the right to proceed against the insurer if his execution against the judgment debtor is returned unsatisfied. This right does not accrue until after judgment is obtained and an execution is returned unsatisfied. However, the statute gives the injured person an interest in the liability insurance policy adverse

___

[12] *See, e.g.*, *Bossert v. Douglas*, 557 P.2d 1164 (Ok. Civ. App. 1976).

30

to both the insurer and insured at the time of the injury. The statute is designed to protect the injured person, not the insurer or insured. It does not permit the insurer and insured to do anything by litigation or agreement between them alone to abrogate or compromise coverage existing at the time of the accident.

*Id.* at 337 (citations omitted).

We do not read Maryland's direct action statute as giving "the injured person an interest in the liability insurance policy adverse to both the insurer and insured at the time of the injury." Reaching that conclusion would require a leap of logic that does not find support in the statutory language. Also, we do not subscribe to the proposition that, with respect to general liability insurance, Maryland's direct action statute "does not permit the insurer and insured to do anything by litigation or agreement between them alone to abrogate or compromise coverage existing at the time of the accident." As the Claimants acknowledge, "[f]or non-mandatory insurance policies, like the Policies here, an insurer can obtain a rescission judgment after a third party suffers a covered injury if the insurer establishes a material misrepresentation by the policyholder in its insurance application." *See North Am. Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 730-31 (D. Md. 1997). The insurer need not join all known (and unknown) tort claimants to such an action before obtaining a judgment of rescission. That being the case, we see no reason why an insurer and insured must involve all known and unknown tort claimants in negotiations to effectively settle such an action, let alone obtain all such claimants' consent to a settlement, provided that any such settlement is made in good faith.[13] It follows that, if the settlements

---

[13] At oral argument, counsel for the Insurers acknowledged the requirement of good faith in the settlement of lawsuits. *See, e.g.*, *Shenker v. Polage*, 226 Md. App. 670, 687

31

of the rescission actions were made in good faith, they will be effective with respect to all claimants who are not intended beneficiaries of the Policies – in this case, the 12 Claimants who did not obtain judgments against the Landlords prior to the rescission case settlements.

Finally, accepting the Claimants' position would lead to undesirable consequences. We agree with the Insurers and *Amicus Curiae* Complex Insurance Claims Litigation Association that recognizing all known and unknown tort claimants as intended beneficiaries of general liability insurance policies will make it very difficult for insurers and policyholders to resolve rescission cases fully and finally, at least where the policies are likely to be claimed upon to cover damages awarded in "long-tail" tort cases (such as lead-paint cases). *See* Kenneth S. Abraham, *The Long-Tail Liability Revolution*, 6 U. PENN. J. LAW & PUB. AFF. 346, 348 (2021) (describing a "long-tail" claim as one that "involves tortious or other liability-creating conduct that causes latent bodily injury or property damage that then manifests itself only many years, and sometimes decades, after the harm-causing conduct occurred"). This would run contrary to Maryland's "strong public policy to encourage settlement." *Matter of Collins*, 468 Md. 672, 697 (2020). As the Insurers explain:

> [I]n order to reach a settlement with its insured that modifies an insurance policy, the insurer would have to identify and sue all claimants within the amorphous pool of potential personal injury claimants, many of whom are

(2016). The parties dispute whether CX and the Landlords settled the rescission cases in good faith. The Claimants allege that the settlements were collusive. The Insurers claim that the Landlords vigorously defended the rescission cases, and that the settlements were the product of good-faith negotiations in light of both sides' perceived litigation risks. For our purposes, it is sufficient to observe that the Insurers generated a factual dispute on this point, preventing the grant of summary judgment to the Claimants on this ground. On remand, the trier of fact will need to decide this question.

unknown, because they have not yet asserted claims. In this case, that pool would include not only all of the young children who resided in the insured properties during the policy periods, but also all of the young children who visited the insured properties during the policy periods. Claimants would assert that everyone who alleged any exposure, at any time, had a vested right upon first alleged exposure. There would be no practical means for an insurer or insured to determine who, if anyone, allegedly had been injured and when.

In addition, we are concerned, as the Insurers put it, that "[b]y requiring this kind of massive litigation, without the prospect of settlement," the Claimants' position would "substantially reduce, and perhaps eliminate, rescission as a remedy for material representations in insurance applications, thereby undermining an insurer's ability to obtain redress for an insured's incomplete or inaccurate disclosures."

For all of these reasons, we are not persuaded that existing Maryland public policy makes all tort claimants intended beneficiaries of general liability insurance policies. If there is to be such a policy, the General Assembly will need to state it expressly through new legislation.

# IV

## Conclusion

For the reasons discussed above, we hold that injured tort claimants who have yet to obtain a judgment against, or enter into an approved settlement with, an insured are not intended beneficiaries of general liability insurance policies, absent public policy modifications or contractual language to the contrary. As such, an injured tort claimant's rights under this type of policy do not vest until the claimant has obtained a judgment against, or entered into a qualifying settlement with, an insured. In this case, the three Claimants who obtained judgments against their Landlords before the rescission case

settlements became intended beneficiaries of the Policies with the right to enforce their terms, as of the dates they obtained their verdicts in the trial court. The settlements of the rescission cases had no effect on the rights of those Claimants. We therefore affirm the judgment of the Court of Special Appeals as to Claimants Devon Johnson, Chauncey Liles, and Shyliyah Streeter on different grounds than articulated by the Court of Special Appeals.

The Claimants who did not obtain final judgments against their Landlords prior to the applicable rescission case settlements were incidental beneficiaries of the Policies at the time of the settlements. To the extent those 12 Claimants since that time have obtained judgments against their Landlords or may do so in the future, they will not be permitted to enforce the pre-settlement terms of the Policies, provided that the settlements were made in good faith. Accordingly, we reverse the judgment of the Court of Special Appeals as to those 12 Claimants. On remand, the trier of fact shall decide whether CX and the Landlords settled the rescission cases involving those Claimants' Landlords in good faith.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. THE CASE IS REMANDED TO THAT COURT WITH THE INSTRUCTION TO FURTHER REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THE COURT OF SPECIAL APPEALS AND THIS COURT TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

34